IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

BENJAMIN ALLEN THAXTON,

      Plaintiff,

v.                                                                Case No.: 2:16-cv-00281

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.


## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 10, 13).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that

1

Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.      Procedural History

On March 23, 2012, Plaintiff Benjamin Allen Thaxton ("Claimant") filed applications for DIB and SSI, alleging a disability onset date of October 22, 2011, (Tr. at 339, 346), due to "disc protrusion in neck and back." (Tr. at 367). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 216-25, 229-34). Claimant filed a request for an administrative hearing, (Tr. at 235), which was initially held on October 29, 2013, before the Honorable H. Munday, Administrative Law Judge ("ALJ Munday"). (Tr. at 123-160). ALJ Munday closed the hearing, but sent interrogatories to Dr. Judith Brendemuehl, an agency consultant, requesting opinions on the severity of Claimant's impairments and his residual functional capacity. Upon receipt of Dr. Brendemuehl's opinions, Claimant requested a supplemental hearing, which was held on July 29, 2014 before the Honorable Peter Jung, Administrative Law Judge ("the ALJ"). (Tr. at 93-116). By written decision dated August 7, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 70-86). The ALJ's decision became the final decision of the Commissioner on December 2, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings.

(ECF Nos. 8, 9). Claimant then filed a Memorandum in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13). Consequently, the matter is fully briefed and ready for resolution.

## II.      Claimant's Background

Claimant was 28 years old at the time that he filed applications for DIB and SSI, and 30 years old on the date of the ALJ's decision. (Tr. at 70). He has a tenth grade education and communicates in English. (Tr. at 366-67). Claimant has previously worked as a grocery store meat cutter, store manager, and produce manager. (Tr. at 132-33, 368).

## III.     Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§

404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 72, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 22, 2011, the alleged disability onset date. (Tr. at 72, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the cervical, thoracic and lumbar spine; obesity; gastroesophageal reflux disease (GERD); hypertension; anxiety; and depression." (Tr. at 72-73 Finding No. 3). The ALJ also considered Claimant's reports of headaches and diabetes, but found that these impairments were non-severe. (Tr. at 73).

Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 73-75, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that he possessed:

> [T]he residual functional capacity to lift up to ten pounds occasionally and less than ten pounds frequently; standing and walking up to two hours a day, and sitting up to six hours in an eight hour day as defined in 20 CFR 404.1567(a) and 416.967(a). Posturally, never climbing ladders, ropes or scaffolds; occasionally climbing ramps and stairs, balance, stoop, crouch and crawl. Manipulatively, with respect to the right upper extremity, with handling as in gross manipulation, is limited to frequently. Environmentally avoiding even moderate exposure to hazards, machinery and heights; and avoiding concentrated exposure to extreme cold, extreme heat, wetness, and vibrations. Psychologically, he is limited to simple repetitive routine tasks with frequent contact with the public.

(Tr. at 75-84 Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform any of his past relevant work. (Tr. at 84-85, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and

education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 85-86, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1983 and was defined as a younger individual age 18-44 on the alleged disability onset date; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled" regardless of his transferable job skills. (Tr. at 85, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as an order clerk, addressor, or surveillance systems monitor at the unskilled, sedentary exertional level. (Tr. at 85-86, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 86 Finding No. 11).

### IV.    Claimant's Challenges to the Commissioner's Decision

Claimant asserts one challenge to the Commissioner's decision. (ECF No. 10 at 14-20). Claimant argues that the ALJ failed to comply with Social Security regulations in evaluating and weighing the medical source statement of Dr. Judith Brendemuehl, an agency consultant. Specifically, Claimant complains that the ALJ only addressed Dr. Brendemuehl's opinion on Claimant's ability to lift and carry, ignoring other equally important limitations imposed by Dr. Brendemuehl. Moreover, Claimant contends that the ALJ failed to provide an adequate explanation for rejecting Dr. Brendemuehl's opinions, instead simply substituting his own non-medical opinions for those of Dr. Brendemuehl.

In response, the Commissioner emphasizes that the ALJ is not obligated to adopt Dr. Brendemuehl's opinions and may reject them if they are inconsistent with the other evidence, or are not well-supported by clinical and diagnostic findings. (ECF No. 13 at 18-21). According to the Commissioner, the ALJ explained the minimal weight he gave to Dr. Brendemuehl's statement, noting that her opinions were inconsistent with the other evidence, including the medical findings upon which Dr. Brendemuehl allegedly relied in rendering her opinions. The Commissioner adds that, as the fact finder, the ALJ is entitled to determine Claimant's RFC based upon the ALJ's own independent analysis of the evidence. Given that the RFC determination is an administrative finding, not a medical opinion, the ALJ was not required to accept or rely on any particular medical source statement in making that determination.

## V.   **Relevant Medical Evidence**

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records

Claimant presented to the Emergency Department at Thomas Memorial Hospital on August 9, 2011 with complaints of moderate neck pain (5 on a 10-point pain scale), as well as pain on the right side of his upper thoracic spine and right interscapular area, which radiated down the right shoulder, arm, forearm, and hand; however, there was no accompanying bladder or bowel dysfunction, sensory loss, motor loss, or saddle paresthesia. (Tr. at 518-20). Claimant reported he had suffered a back injury in 2008 and believed the current aching pain he was experiencing was very similar to that connected with his prior injury. On examination, Claimant's neck was

non-tender, with no vertebral tenderness or painful range of motion exhibited. The max compression test and Jackson compression test were negative. Claimant had no lymphadenopathy, meningeal signs, neck stiffness, or rigidity. Claimant's extremities had a normal range of motion and were non-tender. His right shoulder was neurovascularly intact distally. The Adson test was negative, and his rotator cuff muscle strength measured 5/5. Claimant's right arm was without erythema, tenderness, or swelling, and he showed no signs of a winged scapula or limitation in range of motion. Claimant was assessed with chronic back pain in the thoracic area and was provided a prescription for Ibuprofen. He was advised to refrain from strenuous activity, to remain off work for the remainder of the day, and to follow-up with Dr. Marsha Bailey, a physiatrist. (Tr. at 519).

On September 4, 2011, Claimant presented to the Emergency Department at Saint Francis Hospital with complaints of chronic back and shoulder pain which began three years prior, but had increased in the last month. (Tr. at 590-609). Claimant reported that he had recently gone back to work as a meat cutter, and the job required physical labor that increased his back pain. (Tr. at 594, 603). Claimant denied any new injury or other complaint. A systems review was normal other than neck pain. On examination, Claimant appeared in no acute distress and was alert and oriented. (Tr. at 606). His neck had a normal range of motion, but muscle spasms were documented. Claimant's back was non-tender with a normal range of motion, and his extremities were also non-tender with a normal range of motion and without edema. Claimant's distal pulses were intact. He had a normal neurological and psychiatric examination, with normal gait, mood, and affect. (Tr. at 606). Claimant received a primary diagnosis of neck muscle spasm and neck pain. He was provided prescriptions for Ultram and

Flexeril and instructed to follow-up at the Holzer Clinic. (Tr. at 607).

As instructed, Claimant was examined by Marietta Babayev, M.D., at the Holzer Clinic, on September 13, 2011 for complaints of right upper and mid back pain that periodically radiated to the right hip, thigh, knee, and ankle. (Tr. at 499-501). The pain was not associated with numbness or tingling, but was worse when lying down, standing, bending, and lifting. Claimant told Dr. Babayev he worked full time as a manager of the meat department at a grocery store and his duties included lifting boxes that weighed, on average, 65 pounds. In addition, he had sustained a prior back injury in 2008 and since that time, when experiencing severe back pain, he had episodes of urgent diarrhea. Dr. Babayev reviewed x-rays of the cervical, thoracic, and lumbar spine taken in 2008, all of which were negative.

Dr. Babayev examined Claimant's neck, finding a normal range of motion of the cervical spine, negative Spurlings test, and no acute problems. (Tr. at 500). Examination of Claimant's thoracic, lumbar, and sacral spine revealed painful range of motion of the lumbar spine. The straight leg raise test was negative, as was the sitting root test. Claimant presented with a slumped forward posture and had tenderness on the right thoracic paraspinal and rhomboid muscles with trigger points. Claimant's bilateral shoulder, elbow, and wrist examination showed a normal range of motion with no tenderness or edema. His lower extremities were also unremarkable. Claimant's gait was within normal limits, and he could walk heel/toe and perform tandem gait without issue. Muscle strength testing showed no deficits in both upper and lower extremities. Deep tendon reflexes of upper and lower extremities were bilaterally symmetrical and normal. Additionally, pin prick, light touch, and proprioception were intact in the bilateral upper and lower extremities. (Tr. at 500).

Dr. Babayev ordered additional x-rays and an MRI of Claimant's thoracic spine. Claimant was provided Diclofenac Sodium, trigger point injections, and an order for physical therapy. (Tr. at 501).

Claimant underwent a CT scan of the thoracic and lumbar spine at Thomas Memorial Hospital on September 15, 2011. (Tr. at 514-17). The CT scan of the thoracic spine showed normal alignment of the cervical vertebrae with no evidence of fractures or dislocations. The CT scan of the lumbar spine was also negative, showing no evidence of fracture or dislocation and revealing intact disc spaces and bony spinal canal. No bony or disc pathology was appreciated. (Tr. at 516).

Claimant presented to Thomas Memorial Hospital's Emergency Department on September 19, 2011 with continued complaints of back pain after recent trigger point injections. (Tr. at 507-08). He reported associated bladder and bowel dysfunction. Claimant's physical examination was unremarkable. His range of motion was normal, and he had no motor or sensory deficits. Claimant was instructed to take two days off from work and was given Lortab and a work excuse. (Tr. at 508).

Claimant returned to Dr. Babayev's office a few days later on September 22, 2011 in follow-up for his ongoing pain in the upper right side of his back. (Tr. at 502-03). Claimant reported that his back pain was persistent and severe, and the recent trigger point injections did not alleviate his pain. He told Dr. Babayev that his insurance company would not approve the medication she had prescribed (Diclofenac), and he could not afford physical therapy. On examination, Claimant's lumbar range of motion was painful with forward flexion at eight degrees and extension at twenty degrees; however, Claimant was able to stand on his heels and toes. He had tenderness of the right thoracic paraspinal muscles, but no swelling was seen. Dr. Babayev reviewed

10

Claimant's recent films, noting that they were all negative. Dr. Babayev advised Claimant she had nothing else to offer him to treat his back pain and referred him to the Center for Pain Relief. She also recommended that Claimant have an MRI of the thoracic spine. He was given a prescription of Lortab for pain. (Tr. at 503).

Shortly thereafter, on October 1, 2011, Claimant presented to Thomas Memorial Hospital's Emergency Department, complaining of pain in the lower thoracic spine, which he described as burning and severe, but with no radiation or loss of bladder or bowel function. (Tr. at 504-06). Claimant's physical examination was unremarkable except for a finding of moderate soft tissue tenderness in the right and lower thoracic area and right upper lumbar area. However, Claimant had no vertebral point tenderness or CVA tenderness. He was assessed with a lumbar strain and prescribed Ibuprofen and Flexeril. He was instructed to apply ice intermittently to the painful area and to follow-up with a pain management specialist. (Tr. at 505).

On October 20, 2011, Claimant presented to Richard G. Bowman, M.D., at the Center for Pain Relief, on Dr. Babayev's referral. (Tr. at 539-43). Claimant reported an original back injury in 2008 and a re-injury to his back in September 2011, which caused upper back pain, tingling in his arms, and occasional aching in his hips and legs. Claimant described the pain as burning, dull, aching, and pressure-like. The pain was relieved by lying down and with medication, heat, and relaxation, and the pain increased with standing, sitting, walking, lifting, and exercise. (Tr. at 539-40). Claimant also reported that the pain affected his sleep, remarking that he only slept well when taking medication. (Tr. at 539, 541-42). Claimant stated that physical therapy had helped with his mobility in the past, but did not relieve his pain. Accordingly, he took Lortab to get through the day. (Tr. at 539). Other than his back

complaints, a review of systems was negative.

On examination, Claimant was 5 foot, 9 inches tall and weighed 248 pounds. He had pain along the C7-T1 vertebrae, which radiated into the thoracic spine with cervical flexion, even when the thoracic spine was being held in a comfortable position. (Tr. at 543). He did not have any cervical tenderness, however. Claimant's thoracic spine from T4 through T8 was very tender slightly right of the midline and along the spinous process, yet there was no left-sided thoracic pain or tenderness. Pain was elicited with extension and rotation of the thoracic spine along T4 through T8 on the right, but there was no evidence of rash or palpable deformity. Claimant's lumbar spine was without pain on both palpation and range of motion testing, and Claimant demonstrated an independent gait and transfers. He had equal reflexes. Dr. Bowman reviewed Claimant's MRI scans and concluded that Claimant had a two-fold problem. He appeared to have some facetogenic mediated pain, which was the most likely source of his right thoracic and diskogenic pain, probably C7-T1 or T-2, and this caused marked radicular symptoms to the right thoracic area. To assess the entire situation, Dr. Bowman recommended cervical and thoracic MRI studies. (Tr. at 543).

Claimant returned to St. Francis Hospital's Emergency Department on October 23, 2011, complaining of cervical and thoracic back pain. (Tr. at 570-89). Claimant stated that his pain was chronic, but had worsened two days earlier when he was lifting a heavy object at work. (Tr. at 580). The pain shot down his right arm, causing his right index finger to go numb. Claimant reported having been examined recently by Dr. Bowman; however, as Dr. Bowman was not his primary medical provider, Claimant was not receiving any pain medication from him. (Tr. at 583). Claimant's physical examination was unremarkable with the exception of neck and back spasms. (Tr. at

586). Claimant was assessed with cervical radiculopathy and chronic back pain. (Tr. at 587). He was provided with prescriptions for Lortab and Prednisone and advised to follow-up with Dr. Bowman for pain management.

Claimant returned to Dr. Bowman on October 27, 2011 with constant, severe, burning pain at the midline and right of the midline of C2 through C6, with tenderness and right lateral neck pain. (Tr. at 535-38). His pain was worse when lying on the left side, and with standing, lifting, and walking. (Tr. at 535). His pain lessened with medication and lying down. On examination, Claimant had significant pain along the cervical spine. He had decreased sensation to light touch in the right arm. Claimant complained of pain in his right occipital area on cervical flexion. (Tr. at 538). He had guarding of the neck, minimal active flexion, and significant pain on extension and rotation to the right, but not on extension and rotation to the left. Dr. Bowman suspected that Claimant might have a herniated disc due to the increase in his neck pain, cervical radiculitis, numbness down his arms, and cerviogenic headaches. Dr. Bowman ordered an MRI and provided Claimant with a work excuse. (Tr. at 538).

A few days later, on October 31, 2011, Claimant underwent an MRI of the thoracic and cervical spine at Saint Francis Hospital. (Tr. at 544-46). Results of the MRI of the thoracic spine confirmed the presence of a focal disc protrusion seen at T7-8 and T8-9 on the right, but otherwise, normal signal was maintained in the spinal cord. (Tr. at 544). MRI results of the cervical spine showed degenerative changes and some posterior osteophyte formation that involved the vertebral bodies in the upper cervical spine with areas of neural foraminal narrowing. Mild disc bulges were seen at C4 and C6-C7 with evidence of disc desiccation; however, no isolated protrusions were noted. (Tr. at 545-46).

Claimant returned to Dr. Bowman's office on November 1, 2011. (Tr. at 531-34). He reported persistent pain that varied in severity, but that worsened with standing and sitting too long. (Tr. at 531). The pain interfered with his sleep and increased in his chest when lying on his left side. (Tr. at 532). He also complained of recent headaches at the top of his head. Claimant's physical examination revealed axial thoracic pain along the T7 through T9 with thoracic flexion. Claimant had no cervical pain with palpation, extension or rotation. However, on cervical flexion, Claimant experienced whole back pain in a nondermatonal distribution down to and including the coccyx area, as well as pain and tingling down the back of the legs and feet with full cervical flexion. (Tr. at 534). Dr. Bowman felt that Claimant's primary problem was thoracic disk protrusions at T7-T8 and T8-T9, which in turn caused some radicular pain. For treatment, Dr. Bowman administered thoracic epidural steroid injections.

Claimant presented to the Emergency Department at Saint Francis Hospital on February 29, 2012 with complaints of upper back pain that worsened after an examination the previous day. (Tr. at 547-66). Claimant described the pain as burning, aching and dull; rating the pain as 7 and 9 on a 10-point pain scale. (Tr. at 549, 559). Claimant's physical examination was unremarkable except for vertebral point tenderness, muscle spasm, and a limited range of motion of Claimant's back. His gait was normal. An x-ray of the thoracic spine revealed a borderline enlarged heart, clear lungs, and rightward scoliosis of the upper thoracic spine. Claimant was discharged home with a prescription for Robaxin.

On March 22, 2012, Claimant sought treatment with Dr. Jamie Hayes for back pain stemming from a work injury in August. Claimant reported that he had been placed on workers' compensation, but was released when he reached maximum

medical improvement as determined by the agency in November. (Tr. at 629-31). Claimant stated that he was seeing Dr. Bowman through the pain clinic, but Claimant had lost his insurance coverage and could no longer see Dr. Bowman. Claimant complained of constant pain in his right (dominant) wrist, which prevented him from gripping. In addition, Claimant had neck pain that caused him to get dizzy when he looked down; tingling in the right leg radiating into the ankle; and a burning sensation from the knee to ankle causing tingling in his toes. Claimant stated that he was the meat manager at a local grocery store and re-injured his back while moving furniture for his employer. He was placed on light duty, but shortly afterwards, while lifting a box of meat at work, Claimant felt a "pop" and his arm became numb and cold from the shoulder to the fingertips. He was placed on worker's compensation for five months. Claimant was told the prior Monday that he could return to work; however, he did not feel he could return, because he was unable to perform his job duties. Claimant complained of left-sided chest pain when laying on his left side, occipital headaches, diarrhea with some bowel incontinence, poor sleep, some depression caused by his physical limitations, and weight gain.

On examination, Claimant had pain on palpation of his cervical spine, most notable at the C6 level; and decreased range of motion with flexion/extension of the cervical spine and with turning to the right. He had no cyanosis or clubbing of the extremities. Claimant's right hand showed a decreased grip strength of 3; however, his left hand grip strength measured 5/5. Claimant complained of pain with palpation over the lumbosacral spine, as well as over the right-sided paraspinal musculature. His deep tendon reflexes were 2+ and symmetrical. Claimant was assessed with osteoarthritis, GERD, spinal stenosis in the cervical region, and lumbar radiculopathy. Dr. Hayes

ordered laboratory tests to rule out rheumatoid arthritis, provided Claimant with prescriptions for Etodolac and Dexilant, continued his prescription for Neurontin, and ordered a course of physical therapy. Claimant was also provided a work excuse, advising his employer that Claimant would need to be off work from March 22 to May 3, 2012. (Tr. at 612, 630).

Claimant presented to Thomas Memorial Hospital for a physical therapy initial assessment on March 27, 2012. (Tr. at 613-15). Claimant reported his pain level as 6 out of 10. His pain was worse upon waking and increased whenever he lifted more than fifteen pounds. Claimant stated that when he bent his head forward, wrote, or turned his neck to the right, the pain increased. Claimant also had right upper extremity numbness and tingling, constant pain in his right wrist with upper trapezius swelling and pain into the right scapular region. He complained of right occipital headaches that had increased in frequency. Claimant was able to ambulate without assistive devices and could ascend and descend stairs independently. His postural stance revealed rounded shoulders, forward head, decreased thoracic kyphosis, and forward trunk lean. Claimant reported being independent in activities of daily living, but had disturbed sleep. Physical therapy was scheduled for twice a week for six weeks.

Claimant attended nine physical therapy sessions in 2012: March 29, April 4, April 6, April 9, April 11, April 20, April 23, April 25, and May 1. (Tr. at 616-22). On March 29, Claimant reported his right hand felt "good" while he was performing therapy using a squeeze ball; however, his right wrist joint and elbow hurt in the evening. He took medication, but the medication did not reduce his pain. Claimant also reported one instance of right hand numbness and tingling when performing pectoralis stretching. (Tr. at 616). On April 4, Claimant reported his pain level in the wrist was

"about the same;" although his right hand felt better. By April 6, Claimant described his pain level at 8-9/10 with most of the symptoms located in his right thoracic area with some pain in the upper scapula region. (Tr. at 617-18). On April 9, Claimant complained of intermittent headaches that resolved whenever he was lying down. In addition, he complained of wrist, hand, and neck pain. The therapist noted that Claimant ambulated into the clinic with improved postural alignment; however, after speaking with him, leaving the room and returning, Claimant went back to a flexed posture and slow and guarded pace of gait. On April 11, Claimant reported that neck stretches caused increased wrist and mid back pain. (Tr. at 618). Claimant canceled his April 18 appointment and returned on April 20 reporting it felt "hard to hold his head up" due to weakness at the base of his neck. He did report, however, that his back felt more loose and mobile and his shoulder felt better despite there being crepitus with movement. On April 23 and April 25, Claimant reported neck weakness and pain. (Tr. at 620-21). By May 1, Claimant reported he drove home from the last physical therapy session and upon exiting his car, he felt his right knee was going to buckle. Over the weekend, Claimant had two more similar episodes. Claimant reported his average level of pain was 6 out of 10. (Tr. at 622).

That same day, the physical therapist submitted a progress report to Dr. Hayes. (Tr. at 623). At the most recent therapy session, Claimant continued to rate his pain as 6 out of 10 and estimated that he was functioning at 20% of full capability, which was an improvement over his 10% functioning at initial evaluation. Claimant was observed to have problems with many activities of daily living. His active cervical rotation on the right was limited to fifty percent with pain to the right shoulder. Active range of motion of the shoulder on flexion measured one hundred six degrees with pain on the left and

one hundred thirty-two degrees with pain on the right. Abduction on the left measured one hundred eighty degrees, and on the right was one hundred fifty-four degrees. Manual muscle testing on the right shoulder measured 5/5 on abduction and 4/5 on flexion with pain. Cogwheeling was noted at the right elbow. Grip strength at position 2 on the left measured 102 to 105 pounds and 70 to 80 pounds on the right with wrist pain. Position 3 on the right measured 50 to 60 pounds and position 4 on the right measured 65 to 80 pounds. The therapist indicated that Claimant was "very focused" on pain and would comment after every exercise about the location of his pain. Claimant also was more focused on pain then on executing proper technique with each exercise. The therapist added that when Claimant received work-related activities, he would report a drastic increase in his pain level. Claimant also vocalized that he felt he was regressing with rehabilitation in light of his new complaint of right knee buckling. On May 3, Claimant contacted his physical therapist and reported that his physician wanted him to discontinue physical therapy until an MRI could be performed. (Tr. at 622-23).

Claimant was seen by Dr. Hayes on May 3, June 14 and July 24, 2012. (Tr. at 625-28, 632-33). On May 3, Claimant reported minimal progress with physical therapy, constant pain, and instability of his leg and knee. (Tr. at 632-33). He was using a TENS unit, but now had no feeling from his knee downward and had almost fallen in the past. If he did put weight on his leg, the leg would give out. Claimant indicated that he had been denied short term disability and his workers' compensation claim was denied, so he hired a lawyer and was protesting the workers' compensation decision. Claimant also complained of right arm pain radiating to the elbow; however, he did report improved grip strength. Claimant was also struggling with neck pain that made

it hard for him to turn his head to the right. On examination, Claimant appeared alert and oriented with normal mood. He had decreased range of motion with flexion and extension of the neck and low back, and with side bending. His deep tendon reflexes measured 2+ and were symmetric. Claimant had decreased grip strength of the right hand, although it had improved from prior visits. His straight leg raise test was negative on the right lower extremity.

On June 14, Claimant told Dr. Hayes he felt some improvement with pain while taking Lyrica. (Tr. at 625-26). He also reported he had better energy and was able to spend time outside with his children. However, he continued to complain of lumbar pain with radiculopathy. As Claimant could not tolerate Neurontin, Dr. Hayes prescribed Lortab. On July 24, Claimant reported sleeping four to five hours per night, but continued to complain of low back pain with increased tingling in both legs. (Tr. at 626-27). He also reported a burning sensation from his knees radiating downward. Dr. Hayes noted that Claimant had completed physical therapy with no improvement and his maximum ability to lift during that time was eleven pounds. (Tr. at 628). A July 27, 2012 x-ray of the lumbar spine showed normal bony spine alignment, well-preserved disc spaces, and minimal sclerosis of the lower facet joints. (Tr. at 624).

On August 28, 2012, Claimant returned to Dr. Hayes's office for follow-up. Claimant reported increased low back and right wrist pain and numbness and tingling in the hips down to his knees, which made walking difficult. (Tr. at 654-55). Claimant told Dr. Hayes that his grip strength had not improved; therefore, he was unable to use the equipment required in his job as a meat cutter. Dr. Hayes diagnosed Claimant with lumbosacral spine pain with radiculopathy, spinal stenosis of the cervical spine, and GERD. (Tr. at 655). He instructed Claimant to proceed with an MRI.

Later that same day, Claimant presented to Thomas Memorial Hospital for an MRI of his lumbosacral spine. (Tr. at 657). The study showed lumbar vertebrae that were preserved in height, alignment, and marrow signal intensity. The conus medullaris was seen at T-12 and did not appear grossly expanded. Claimant's aorta was determined to be of normal caliber. He did not have any abnormal high grade central canal stenosis or abnormal paravertebral soft tissue mass. The radiologist interpreted the study as showing mild facet arthropathy at L4-5 and L5-S1 and disk desiccation at T11-12; however, there was no disk herniation or high grade central canal narrowing. (*Id.*).

Claimant returned to Dr. Hayes on September 25, 2012 with complaints of persistent back pain, measuring 8 out of 10 on the pain scale, and depression. (Tr. at 652-53). Claimant reported that Prozac did not relieve his depression, and instead, caused him to experience vivid dreams. Claimant's prescription for Prozac was changed to Zoloft, and he was once again referred to Dr. Bowman for management of chronic pain.

Dr. Bowman examined Claimant for complaints of back and neck pain on October 18, 2012. (Tr. at 659-64). Claimant described the pain as shooting, sharp, and constant. The pain was relieved by lying down, and with medication and relaxation. It worsened with standing, sitting, walking, and exercising. According to Claimant, the majority of his pain was in his lower back, occasionally radiating to his right hip and lateral thigh with numbness and tingling down to the knee. With respect to his neck pain, Claimant reported that when he turned his head to the right, the pain would go down to his mid-back. Looking down caused increased pain, as well as a shooting pain that went from the base of the neck down the spine to the tailbone. (Tr. at 659).

On examination, Dr. Bowman observed that Claimant ambulated independently in and out of the clinic and did not demonstrate any somnolence, sedation, or confusion. He had no thoracic pain on palpation or with range of motion; however, he complained of axial lumbar pain along L4 through S1, radiating into the upper buttocks, induced by extension, rotation, and axial loading of the facet joints. He had minimal pain with flexion. Claimant's straight leg raise test, while seated, was negative at ninety degrees bilaterally. He reported numbness in the legs from the mid-calves distally, which was consistent with burning symptoms that increased when Claimant sat still and relaxed, but improved or almost resolved upon standing. Dr. Bowman felt this pain was suggestive of peripheral neuropathy despite the absence of a diagnosis of diabetes or thyroid disease. Claimant's low back pain and lumbar radiculitis were indicative of facet arthropathy; particularly, given the lack of other definite causes on MRI. Dr. Bowman recommended an EMG to test for neuropathy and bilateral L3 through S1 facet blocks times two, followed by reevaluation. Claimant was also assessed with bulging thoracic disc, cervical and lumbar spondylosis, cervicalgia, and lumbar radiculopathy. (Tr. at 662).

Claimant presented to Dr. Hayes on October 26, 2012 complaining of back pain after lifting furniture. (Tr. at 550-51). Shortly thereafter, on November 15, 2012, Claimant returned to Dr. Hayes reporting he had appeared for a functional evaluation; was required to sit in a chair for seven hours, and now had severe, burning back pain in addition to elevated blood pressure. (Tr. at 648-49). Dr. Hayes prescribed Norvac and Lortab.

On December 3, 2012, Dr. Bowman conducted an EMG and nerve conduction study to evaluate Claimant's complaints of back pain accompanied by pain and tingling

in the bilateral lower extremities. (Tr. at 640-43). The results demonstrated evidence of bilateral L5 radiculopathy; however, there was no evidence of focal peripheral nerve entrapment. Claimant returned to Dr. Bowman on December 12, 2012 for corticosteroid injection to the bilateral fact joints at the L3-L4, L4-L5, and L5-S1. (Tr. at 673-75, 765-778). The following day, Claimant saw Dr. Hayes and reported that the injection area remained painful. (Tr. at 646-47). Dr. Hayes assessed Claimant with facet arthropathy, chronic low back pain, depression, and hypertension. Claimant was advised to continue receiving the injections by Dr. Bowman. Claimant's medication regimen remained unchanged with the exception of the Zoloft dosage, which was increased to one hundred milligrams per day.

Throughout 2013, Claimant continued to receive treatment from Dr. Hayes, (Tr. at 644-45,695-702, 705-710, 869-71), and Dr. Bowman. (Tr. at 665-72, 691-94, 794-804, 899-908). On January 9, 2013, Dr. Bowman administered another corticosteroid injection into the bilateral facet joints at the L3-L4, L4-L5, and L5-S1. (Tr. at 670-72). Dr. Bowman assessed Claimant with lumbar spondylosis. A few days later, on January 15, Claimant was examined by Dr. Hayes. (Tr. at 644-45). Claimant reported the injections had not provided any pain relief. In addition, he was having muscle spasms at night as well as hip pain and tingling in his legs. Dr. Hayes increased Claimant's dosage of Lyrica and Zoloft.

On January 17, 2013, Claimant reported to Dr. Bowman that the injections did not relieve his back pain. (Tr. at 665-69). On examination, Claimant was alert, oriented, and ambulated independently. His lumbar spine, at L3- S1, exhibited significant pain, induced with extension, that radiated into the buttocks and posterolateral thighs down to the knees, particularly when standing. Claimant also

exhibited right lateral wrist pain and pain along the ulnar groove as well as some abnormal light touch along the right lateral wrist along the ulnar nerve. Claimant showed one and equal reflexes of the bilateral brachloradialis and biceps tendons; one and equal reflexes of the bilateral patella tendons, and trace and equal reflexes of the bilateral Achilles tendons. Dr. Bowman believed that, based upon Claimant symptoms, his reaction to the injections, and his EMG finding of bilateral L5 radiculopathy, Claimant likely suffered from diabetic polyradiculopathy. In support of that diagnosis, Dr. Bowman documented Claimant's report of high sugar levels that he controlled with diet. Dr. Bowman referred Claimant to Dr. Murthy for evaluation of neuropathy versus polyradiculopathy. In addition, he scheduled Claimant to receive a spinal cord stimulator.

On February 15, 2013, Claimant presented to Dr. Hayes with complaints of severe back, neck, and wrist pain along with tingling of the legs. (Tr. at 701-02). The intake nurse noted that Claimant was currently seeing a psychiatrist for the purpose of placement of a spinal stimulator. At this visit, Claimant had gained eight pounds, weighing 286 pounds. He also complained of headaches averaging two per week. Claimant was assessed with GERD, chronic pain, headache, weight gain, insomnia, and hypertension. He was provided samples of Relpax for headaches, as well as prescriptions for Imitrex, Dexilant, Lortab, Norvasc and Trazadone.

Claimant returned to Dr. Hayes on March 15 and April 16, 2013. (Tr. at 697-700). He continued to gain weight, weighing 291 pounds on March 15 and 292 on April 16. On March 15, Claimant complained of low back pain such that he could not bend forward. (Tr. at 700). Dr. Hayes advised Claimant to continue follow-up with the pain clinic, prescribed Relafen, and decreased the dosage of Claimant's hydrocodone

23

prescription. On April 16, Claimant reported he was having increased burning pain from his elbow to the wrist bilaterally. (Tr. at 697). Claimant also told Dr. Hayes he did not do well with the decrease in the hydrocodone. Dr. Hayes continued the medication regimen with the addition of Lortab.

Claimant returned to Dr. Bowman on May 2, 2013. (Tr. at 691-94). Upon examination, Claimant continued to have neck, back, and arm pain. The pain was greater with flexion than with extension and although it varied, at this examination, it tended to radiate down the left arm more so than the right. Claimant had severe back pain that radiated down both buttocks, posterior and lateral thighs, calves and feet. Pain was elicited with lumbar flexion over forty degrees. Claimant experienced severe pain on transitioning from a flexed or sitting position to standing. Claimant complained of pain on extension of his back when standing; however, Claimant did have one and equal reflexes of the bilateral brachioradialis, biceps, patella and Achilles tendons.

Dr. Bowman acknowledged that Claimant had been denied authorization for use of a spinal stimulator which, in Dr. Bowman's opinion, was the "last resort" treatment option available to Claimant. Dr. Bowman told Claimant that his only option now was to be completely sedentary. Dr. Bowman advised against the use of high dose opioids and activities that might make Claimant "hurt himself worse," and "end up on a Morphine pump due to opioid tolerance over time." (Tr. at 694). Dr. Bowman instructed Claimant to take the absolute minimum dose of opioids and "do effectively as close to nothing as possible." He lamented that Claimant was going to be "disabled for life because of his injuries, combined with the fact he is unable to get access to last resort treatment due to his unfortunate denial of available treatment for his chronic

neuropathic pain or the trunk and limbs and his neck and arms and low back and legs respectively." (Tr. at 694).

Claimant returned to Dr. Hayes on May 20 and June 17, 2013. (Tr. at 695-96, 709-10). On May 20, Claimant rated his pain at 6 out of 10, stating that Lyrica had offered him significant improvement. Upon examination, Claimant's neck was supple and exhibited a full range of motion. Claimant was alert and oriented and was observed walking with a normal gait. Claimant was advised to continue with his medication regimen. On June 17, Claimant reported he had been out of medication for two days and was experiencing pain at a level of 8 out of 10. However, he had full range of motion in his neck and all joints. Claimant received prescriptions for refills of Etodolac and Hydrocodone.

On June 27, 2013, Claimant returned to Dr. Bowman with a new complaint of bilateral leg numbness. (Tr. at 800-04). Claimant told Dr. Bowman that hydrocodone and Lyrica, prescribed for him by Dr. Hayes, offered him no pain relief. Upon examination, Claimant had no thoracic pain with flexion, palpation, or rotation. He complained of pain in his lumbar spine along L3 through S1 level that radiated into the upper buttocks and was induced by standing or walking. The pain improved with sitting. Claimant also reported some cervical pain with flexion and extension along C6-7 with some mild tenderness of the paraspinal musculature. As Claimant could not obtain approval from Medicaid for a spinal cord stimulator, Dr. Bowman opined that Claimant's only option for pain relief was narcotics, which he would have to take the remainder of his life and which would ultimately render Claimant "permanently disabled." Claimant was given a prescription for Lortab five to ten. Claimant was placed on a narcotic agreement and urine drug screen schedule. (Tr. at 803).

Claimant returned to Dr. Hayes on July 18, 2013. (Tr. at 707-08). His review of systems was positive for depression although he was alert and fully oriented. Upon examination, Claimant's neck was supple and all joints evidenced full range of motion. Claimant was assessed with chronic low back pain, in addition to GERD and hypertension, both of which were controlled. Dr. Hayes prescribed Dexilant, Zoloft, Norvasc, and Lyrica.

On August 16, 2013, Claimant returned to Dr. Bowman complaining of constant neck and back pain described as dull, aching, burning, throbbing, tingling, and accompanied with numbness. (Tr. at 796-99). Claimant's medication regimen included Dexilant, Etodolac, Hydrocodone, Lyrica, Norvasc, and Sertraline. Claimant reported that he was "doing pretty well for the most part," and his medications were "working fine with the use of hydrocodone." On examination, Claimant weighed 298 pounds with a body mass index of 44. Claimant was alert and pleasant although his affect was slightly flattened. His neck was supple. Claimant had bilateral low back tenderness in the area of L4 distal to PSIS, left side worse than right. His sacroiliac joint showed mild tenderness at the superior portion; however, the sciatic notch was not tender. Straight leg raise test was negative, and there appeared no sign of peripheral edema. Claimant was assessed with low back pain and lumbar radiculopathy. Three days later, on August 19, Claimant returned to Dr. Hayes reporting improved sleep and improved pain level; however, he did experience occasional headaches triggered by neck pain. (Tr. at 705-06).

On October 21, 2013, Claimant presented to Dr. Hayes with complaints of stiffness in the right knee brought on by colder temperatures and caused a buckling sensation of the knee. (Tr. at 878). A review of systems revealed occasional headaches,

weight loss (284 pounds at this visit), and improved depression.

A few days later, on October 24, Claimant returned to Dr. Bowman reporting his low and mid back pain hurt worse than the neck pain and taking hydrocodone knocked "the edge off." (Tr. at 904-08). The pain in his back was described as traveling from the mid back down the spine to the lateral right leg and knee and occasionally, to the feet. It was accompanied by numbness and tingling in the lateral right thigh. The neck pain radiated to the bilateral shoulders, right worse than left and there was pain in his right wrist that radiated to the elbow. Upon examination, Dr. Bowman opined that Claimant had chronic lumbar radiculitis, stable on Lortab, with no side effects. A urine drug screen was positive for marijuana, which Claimant strongly denied using, and opioids, for which he had a prescription.

On December 19, 2013, Claimant returned to Dr. Bowman for follow-up. (Tr. at 899-02). On examination, Claimant ambulated independently. There was no thoracic pain with palpation or range of motion; however, he did have lumbar pain, worse on the right, in the low back, and bilateral buttocks. The pain was induced when he stood or walked, but improved upon being seated. Claimant had a positive straight leg raise test for buttock pain bilaterally seated at sixty degrees. Claimant had a negative Patrick's test bilaterally. Claimant's prior drug screen, sent off for verification, confirmed his medication compliance.

On February 18, 2014, Claimant presented to Dr. Bowman with complaints of chronic low back pain which was constant and radiated down both legs to his feet. (Tr. at 894-98). The pain was accompanied with numbness and tingling in the bilateral legs to the mid thighs. Claimant did remark that taking hydrocodone and Lyrica gave some pain relief; however, his insurance was no longer approving Lyrica. Dr. Bowman

reiterated that Claimant needed a stimulator, but that was also denied by his insurance. Upon examination, Claimant had no thoracic pain but did have pain in the low back along L4 through S1 that radiated into the buttocks and posterior thighs induced with standing or walking and improved upon being seated. Claimant had a positive straight leg raise test seated at seventy degrees bilaterally.

On March 18, 2014, Claimant presented to the Emergency Department at Saint Francis Hospital with complaints of neck and back pain. (Tr. at 462-93). Claimant reported having suffered a lifting injury in 2011 and receiving treatment from Dr. Bowman since that time for low back, neck, and radicular pain in the right arm and legs. Claimant advised the medical provider that he was taking prescribed oral pain medication; however, it was not relieving the pain. Claimant was treated and instructed to follow-up with Dr. Bowman.

Claimant returned to Dr. Bowman on April 1, 2014 complaining of chronic neck and low back pain, anxiety, and depression. (Tr. at 889-93). Claimant told Dr. Bowman his pain had increased since his last visit; most particularly with prolonged sitting, standing, or when supine, requiring him to constantly change positions. Although he was obtaining some relief with Norco, Claimant felt that his medications were no longer working. Once again, Dr. Bowman opined that a spinal cord stimulator was Claimant's last resort treatment option, but his medical coverage would not authorize it. Claimant had been seen by a neurosurgeon who felt he could not offer Claimant any assistance. Dr. Bowman advised Claimant if he had to go to the hospital emergency room every day for pain relief, to do so, as Claimant's insurance would not allow him to get the medically necessary treatment. In the meantime, Dr. Bowman was going to seek authorization for cervical epidural steroid injections.

Claimant presented three days later, on April 4, to Saint Francis Hospital's Emergency Department for exacerbation of chronic pain. (Tr. at 835-66). Claimant reported that his entire back and neck hurt, and that he had taken a Lortab with no relief. On examination, Claimant walked with a normal gait. However, he had limited range of motion of his back, muscle spasm, and tenderness to palpation in the paravertebral area of the bilateral lumbar spine. (Tr. at 854). Claimant appeared anxious but, otherwise, the examination produced normal findings. Claimant was assessed with chronic back pain, advised to alternate use of heat and ice to his low back, to consider weight loss and yoga, and to follow-up with Dr. Hayes. The medical provider also discussed with Claimant his frequent visits to the Emergency Department. Claimant explained that Dr. Bowman told him to come to the Emergency Department as often as he needed, because his prescription of Lortab no longer provided adequate pain relief, and Dr. Bowman could not offer any other treatment under Medicaid guidelines. (Tr. at 857). The provider explained that the Emergency Department was not the proper place to seek treatment for chronic pain. (Tr. at 857). She indicated that the Emergency Department would no longer provide Claimant with narcotics, because he would simply develop a tolerance to them, and he needed to explore other treatment options. Nonetheless, Claimant was told to return to the Emergency Department if he developed symptoms of cauda equina syndrome, a fever, difficulty walking, or problems with incontinence. (Tr. at 856-57).

On May 7, 2014, Claimant presented to Dr. Bowman for corticosteroid injection in the C7-T1 epidural space. (Tr. at 886-88). Claimant returned to Dr. Bowman on May 21 to receive a second corticosteroid injection. (Tr. at 883-85). On June 4, Claimant received a third corticosteroid injection. (Tr. at 880-82).

Claimant followed-up with Dr. Bowman on June 5, 2014. (Tr. at 875-78). Claimant complained of neck, upper back, right arm, and low back pain, ranging in severity between 6 and 9 on the 10-point scale. Claimant reported that after his third injection the day before, he experienced severe muscle spasms. Claimant's current medication regimen included Dexilant, Etodolac, Lisinopril, Lyrica, Norvasc, Percocet, and Sertraline. Claimant told the intake nurse he was taking the Percocet as directed with positive relief; however, pain relief from his medications lasted only five hours. A review of systems was found to be within normal limits other than sleep disturbance.

On examination, Claimant's neck and arm pain appeared to be worsening. The neck pain appeared prominently on the right at C4 through C7 and radiated into the trapezius muscle and down the arms. Claimant had constant pain at the dorsal lateral wrist that worsened whenever his neck pain was exacerbated. Claimant had numbness in the right thumb; however, the left arm was not affected. Although Claimant demonstrated independent gait and transfers, he continued to complain of pain along the back radiating into the buttocks upon standing, walking, flexing and extending. Dr. Bowman observed that the corticosteroid injections had not successfully relieved Claimant's pain, and although Claimant took Percocet every day, it also did not relieve his pain. Dr. Bowman advised Claimant he would arrange for a neurosurgical consultation.

Claimant returned to Dr. Bowman later that month, on June 24, complaining of neck, upper back, and right arm pain. (Tr. at 910-14). Clamant also reported his headaches had returned; his pain was getting worse; and Percocet offered minimal relief. Dr. Bowman examined Claimant, finding neck and arm pain. Claimant had one and equal reflexes on the bilateral brachioradialis and biceps tendons. Dr. Bowman

30

found no cyanosis, clubbing, edema or numbness of Claimant's arms. Dr. Bowman assessed Claimant with intractable neck and arm pain. Claimant was awaiting a neurosurgical consultation. In the interim, Dr. Bowman advised he would increase Claimant's medications to four times per day, which was the highest dosage he could prescribe.

On July 24, 2014, Claimant presented to Saint Francis Hospital for an MRI of the cervical spine as referred by Dr. Bowman. (Tr. at 940-42). Findings revealed multilevel degenerative disc disease and uncovertebral hypertrophy with accompanying mild neural foraminal narrowing.

### B. Evaluations and Opinions

On June 20, 2012, Caroline Williams, M.D., completed a Physical Residual Functional Capacity Evaluation. (Tr. at 175-78). Dr. Williams found that Claimant could occasionally lift and carry twenty pounds; frequently lift and carry less than ten pounds; stand, walk, and sit six hours in an eight-hour work day; and was unlimited with pushing or pulling aside from his lifting restrictions. Dr. Williams found Claimant had postural limitations in that he could occasionally climb ladders, ropes, or scaffolds, stoop, or crawl. He could frequently climb ramps or stairs, kneel and crouch, and he had no restrictions with balance. As to manipulative restrictions, Claimant could reach in any direction, including overhead, finger, and feel without limitation; however, she found Claimant limited in the right hand with handling only on a frequent basis. Claimant had no visual or communicative limitations. In regard to environmental limitations, Claimant's exposure to extreme heat, wetness, humidity, noise, dust, odors, gases or poor ventilation was unlimited; however, he needed to avoid concentrated exposure to extreme cold, vibration, or hazards like machinery and

31

heights. Based upon Dr. Williams's review of the medical records, as well as Claimant's reported activities of daily living—which included independent personal care, ability to prepare meals, go out alone, drive, shop, spend time with others and attend medical treatment appointments—Dr. Williams concluded that Claimant's impairments did not meet or equal a listing. On July 6, 2012, Pedro F. Lo, M.D., reviewed the file and concurred with Dr. Williams's statement. (Tr. at 201-05).

On February 7, 2013, Tracy P. Smith, M.A., completed a Psychological Evaluation at the request of Dr. Bowman in order to support a neurostimulator. (Tr. at 686-90). Claimant provided the history of his back injury, which occurred in August 2011 while helping to move furniture. Claimant received trigger point injections that were unsuccessful and then went without medical treatment from November 2011 to February 2012. On February 28, 2012, Claimant underwent an independent medical examination for workers' compensation. He was found to have reached maximum medical improvement and could return to work. Claimant eventually underwent physical therapy for six weeks and subsequently concluded that he could no longer work. An MRI revealed noticeable disc degeneration. Dr. Bowman completed a nerve conduction study which confirmed nerve damage; therefore, a spinal cord stimulator was recommended, but was denied.

Claimant reported that he had no history of depression prior to his injury. Since his injury, however, he had become depressed over his financial situation and his decreased ability to participate in activities, including work. He reported that his family doctor had been treating him for depression for the past six months. Claimant described his daily activities as performing personal care, watching television, visiting his father who lived next door, and driving. He could no longer do any household

chores or yard work. Claimant told Ms. Smith he only slept three to four hours a night due to pain. His energy level was low, and his appetite had increased which caused him to go from weighing 225 pounds at five feet nine inches tall, to weighing 290 pounds.

On examination, Claimant presented a fair prognosis, limited primarily due to his physical issues. Claimant displayed a fair energy level, appropriate affect, normal speech, intact thought process, and normal thought content, although his mood revealed depressed tendencies. Ms. Smith administered the WAIS-IV test which revealed verbal comprehension measuring 85, perceptual reasoning at 75, working memory at 77, processing speed at 94 and a full scale IQ measuring 80. The WRAT-4 test scores revealed word reading at a grade equivalent of 6.9, sentence comprehension at a grade level of 10.7, spelling at a grade level of 4.4, and math computation at a grade level of 6.3. The Beck Depression Inventory revealed extremely high scores for depressive tendencies. However, the MMPI-2 results reflected both over-reporting and under-reporting of symptoms, which made Ms. Smith question the validity of the test. (Tr. at 689).

Based on her examination, Ms. Smith diagnosed Claimant with major depressive disorder, single episode by history, mild to moderate. He had a Global Assessment of Functioning score of 50-55, indicating moderate psychological symptoms. Ms. Smith recommended continued medication for treatment of depression with the possible addition of counseling in the future. Ms. Smith documented Claimant's understanding that a spinal cord stimulator would not entirely alleviate his pain. (Tr. at 689-90).

On December 4 and 5, 2013, Claimant underwent a Functional Capacity Examination at Holzer Medical Clinic. (Tr. at 436-60). Claimant started with a

tolerance test to determine his metabolic equivalents in exercise, followed by a constant evaluation for function. Due to Claimant's extremely slow pace in performing the tests, the twelve-minute walk test, the occasional testing frequency material, and the non-material frequency handling activities were not completed. Similarly, Claimant finished less than one out of thirty possible circuits on the constant test. He could not complete the exercise tolerance test for safety reasons; only finishing a little over three laps on the track in twelve minutes. Claimant stood for thirty minutes before sitting when taking the repetitive movement and box lift tests. Throughout the evaluation, Claimant moved so slowly that the number of activities he could complete was limited. During the repetitive movement test, Claimant's range of motion while bending and squatting was very limited, and his overhead reach was slightly limited. According to the therapist who administered the tests, Claimant's overall physical demand level fell below sedentary. Claimant scored sixty-six out of one hundred six in validity criteria which resulted in a sixty-two percent pass rate. This score indicated an invalid validity profile with a poor effort factor. Claimant's pain profile results were high.

On April 2, 2014, Judith Brendemuehl, M.D., completed a Medical Interrogatories Physical Impairments form at the request of ALJ Munday. (Tr. at 826-28). Based on a review of Claimant's medical records, Dr. Brendemuehl opined that Claimant suffered from a pain disorder, although it was "[d]ifficult to put [it] all together." (Tr. at 826). Dr. Brendemuehl noted that Claimant largely complained of neck and thoracic pain yet a CT scan of the thoracic and lumbar spine taken in September 2011 showed normal results. An MRI of the thoracic spine taken October 31, 2011 showed disc protrusions at T7/8 and T8/9, but with normal spinal cord signal.

A cervical spine MRI taken that same day showed minimal left-sided narrowing at C3/4 and minor degenerative changes. Claimant had an MRI of the lumbar spine in August 2012, which revealed mild facet arthropathy at L4/5 and L5/S1, but no canal or foraminal stenosis and no disc herniation. EMG and nerve conduction studies on the lower extremities resulted in an assessment of bilateral L5 radiculopathy although Dr. Bowman, who performed the study, noted there was no evidence of discogenic disease on the MRI. Dr. Bowman opined that Claimant had probable polyneuropathy, most likely from diabetes. Dr. Brendemuehl commented, however, that the records did not document a diagnosis of diabetes, and Claimant's blood sugar was 96 when tested.

Dr. Brendemuehl opined that Claimant's medically determinable impairments, combined and separately, did not meet or equal any impairment described in the Listing. Looking specifically at Listing 1.04A, Dr. Brendemuehl stated that none of the objective evidence established spinal cord compromise or significant neural foraminal compromise. Although the medical records did reveal some range of motion issues and varying sensory complaints, the clinical findings were not consistent with radicular pain along a specific nerve root. Dr. Brendemuehl acknowledged seeing a diagnosis of extreme neuropathic pain in the record, similar to the pain associated with diabetes, but she could find no diagnosis of record that would produce neuropathic pain. Dr. Brendemuehl commented that Claimant was supposed to have a neurology consultation, but that did not appear to have occurred. She also observed that Claimant had a "considerable pain focus" along with depressive symptoms, and at one point in a functional capacity evaluation, Claimant reported his pain as 10 out of 10. However, his blood pressure measured 124/65, his pulse was 61, and he declined EMS, all of which were inconsistent with the stated level of pain. Dr. Brendemuehl felt there was

minimal objective evidence in the record to support the level of pain severity described by Claimant. As for Claimant's functional limitations, Dr. Brendemuehl referred to the results of Claimant's functional capacity evaluation, which found him to be functioning at a sedentary level. She commented that the limiting factors identified in that evaluation were similar to Claimant's current status. (Tr. at 828).

That same date, Dr. Brendemuehl completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (Tr. at 829-34). Dr. Brendemuehl found Claimant could frequently lift and carry less than ten pounds, could occasionally lift and carry as much as ten pounds, but could never lift and/or carry over ten pounds. Claimant could sit two hours without interruption, and stand and/or walk twenty minutes without interruption. In an eight-hour workday, Claimant could sit for a total of eight hours and stand and/or walk a combined two out of eight hours. Claimant did not require a cane or assistive device for ambulation. Claimant could never reach overhead with either hand but could reach in all other directions with either hand occasionally. He could continuously handle, finger or feel with both hands, and could push and/or pull with either hand occasionally. Claimant could operate foot controls with either foot occasionally. Claimant could occasionally climb stairs and ramps, balance, stoop, and crouch. He could never climb ladders or scaffolds, kneel, or crawl. Claimant had no visual or auditory limitations. As to environmental limitations, Claimant had no limitations with exposure to humidity, wetness or noise; however, he should avoid concentrated exposure to extreme cold, heat and vibrations. Claimant should never have exposure to unprotected heights or moving mechanical parts. He could operate a motor vehicle occasionally; however, he should never do so while taking prescribed narcotics. Claimant could perform activities such as shopping;

traveling without a companion; ambulating without assistance; walking a block at a reasonable pace on rough or uneven surfaces; using standard public transportation; climbing a few stairs at a reasonable pace; preparing a simple meal; caring for his personal hygiene; and sorting, handling, or using papers or files.

Dr. Brendemuehl found Claimant's current limitations began on October 31, 2011, which was the date in the medical evidence establishing abnormal findings, and opined that his limitations would last for twelve consecutive months. Dr. Brendemuehl emphasized that Claimant was not receiving treatment at that time that would effectively alter his condition. However, she recommended that Claimant's RFC be reassessed if his treatment situation changed. (Tr. at 834).

## VI.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the

decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.   <u>Discussion</u>**

Claimant's challenge to the Commissioner's decision involves the ALJ's evaluation of a medical source statement provided by a non-examining agency consultant; specifically, the weight given to the statement and the analysis that resulted in the weight afforded to the consultant's opinions. Claimant contends that the ALJ failed to properly weigh Dr. Judith Brendemuehl's statement, because the ALJ focused on only one aspect of the statement and ignored other significant points made by Dr. Brendemuehl. Claimant additionally argues that the ALJ's discussion of Dr. Brendemuehl's statement failed to provide a reasonable explanation for rejecting the statement.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-

examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). In the absence of a treating physician's opinion that has been afforded controlling weight, the ALJ must analyze and weigh all of the medical source opinions in the record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion. *Id.* §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Although 20 C.F.R. § 404.1527(c) and § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996) (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has

39

a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D. W.Va. Sept. 30, 2014); *see, also, Aytch v. Astrue*, 686 F.Supp.2d 590, 602 (E.D.N.C. 2010) (holding that while the ALJ is required to *consider* all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to *discuss* all evidence in the record.") (emphasis added); *and Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, Case No. 2:08-cv—20-FL, 2009 WL 2135081, at *4 (E.D.N.C. July 15, 2009).

   With respect to the weight given to Dr. Brendemuehl's medical source statement, the undersigned **FINDS** that the ALJ complied with Social Security regulations and rulings in affording the statement little weight. As the ALJ did not give controlling weight to any treating physician's opinion, he was required to consider all of the medical source statements and weigh them. The ALJ properly examined each of the statements, discussing the specific opinions offered by the various medical sources regarding Claimant's function-by-function limitations, and he weighed them. Given that none of the agency consultants were treating or examining sources, the ALJ emphasized the consistency and supportability of their opinions. He found the opinions of Dr. Williams and Dr. Lo to be entitled to great weight due to their

consistency with the other evidence of record. In contrast, the ALJ determined that Dr. Brendemuehl's statement, including her opinions regarding Claimant's function-by-function limitations, were not entitled to much weight, because they were inconsistent with the evidence and were not well-supported by the medical findings she referenced in her statement. (Tr. at 84). Thus, the ALJ provided good reasons for discounting Dr. Brendemuehl's opinions.

As to Claimant's argument that the ALJ did not properly explain the reasons for the weight given to Dr. Brendemuehl's statement, the undersigned **FINDS** that position to be without merit. The ALJ was required to "give good reasons" for the weight afforded the medical source statements. As previously stated, this was done. With respect to Dr. Brendemuehl's statement, the ALJ provided a clear explanation, with references to specific pieces of evidence, for the reduced weight he gave to Dr. Brendemuehl's RFC assessment. The ALJ expressly noted the various functional limitations outlined in Dr. Brendemuehl's statement, but rejected them as being "inconsistent with the evidence of record." (Tr. at 84). In particular, the ALJ underscored that many of the diagnostic tests relied upon by Dr. Brendemuehl contained nothing more than mild findings, which simply did not support the severity of the limitations outlined by Dr. Brendemuehl. Contrary to Claimant's contention that the ALJ only considered Dr. Brendemuehl's lifting and carrying restrictions, the ALJ explicitly examined the functional limitations identified in Dr. Brendemuehl's RFC assessment. The ALJ was not required to comment on each discrete functional limitation, as long as the reasons for rejecting the medical source statement were articulated. The ALJ specifically mentioned the lifting and carrying limitations provided by Dr. Brendemuehl for emphasis, to highlight the perceived shortcomings

of her medical source statement. The ALJ pointed out the blatant contradiction between Dr. Brendemuehl's severe lifting and carrying limitations and Claimant's statements that he could comfortably carry ten pounds.[1] Because the court is ***not*** "left to guess about how the ALJ arrived at his conclusions on [Claimant's] ability to perform relevant functions," the ALJ's analysis is sufficient, allowing meaningful judicial review. *Mascio v. Colvin,* 780 F.3d 632, 637 (4th Cir. 2015).

Claimant argues that the ALJ deviated from Social Security regulations and rulings by substituting his own judgment for that of the medical sources in formulating Claimant's RFC finding. However, the United States Court of Appeals for the Fourth Circuit and this court have recognized that the RFC assessment is an administrative finding, not a medical opinion. *Felton-Miller v. Astrue*, 459 F. App'x 226, 230-21 (4th Cir. 2011) (stating that RFC "is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record.") (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)); *Youkers v. Colvin*, No. 3:12-9651, 2014 WL 906484, at *10 (S.D. W.Va. Mar. 7, 2014); *Starcher*, 2013 WL 5504494, at *8. Accordingly, an ALJ is not required to adopt or defer to a medical opinion to determine a claimant's RFC. *Felton-Miller*, 459 F. App'x at 230-31; *Hucks v. Colvin*, No. 2:12-cv-76, 2013 WL 1810658, at *9 (N.D.W.Va. Apr. 3, 2013), *report and recommendation adopted by* 2013 WL 1810656 (N.D.W.Va. Apr. 29, 2013); *see also Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the

---

[1] Although Claimant challenges the accuracy of the ALJ's interpretation of Claimant's statements, the record confirms that Claimant testified at his first administrative hearing that he could comfortably lift and carry ten pounds. (Tr. at 139). At his second hearing, he testified that he could comfortably lift and carry five pounds, but would have symptoms when lifting and carrying fifteen pounds. (Tr. at 109). Moreover, Claimant was able to repeatedly lift eleven pounds during physical therapy. (Tr. at 620, 628).

functional capacity in question."); *Sullivan v. Comm'r of Soc. Sec.*, No. 2:13-cv-1460-KJN, 2014 WL 6685075, at *4 (E.D. Cal. Nov. 25, 2014) ("It is the ALJ's responsibility to formulate an RFC that is based on the record as a whole, and thus the RFC need not exactly match the opinion or findings of any particular medical source."); *Mitchell v. Comm'r of Soc. Sec.*, No. SAG-12-3332, 2013 WL 5182801, at *1 (D. Md. Sept. 12, 2013) ("An ALJ need not parrot a single medical opinion, or even assign 'great weight' to any opinions, in determining an RFC."); *Thomas v. Colvin*, No. 12-227-N, 2013 WL 1218920, at *8 (S.D. Ala. Mar. 25, 2013) (recognizing that RFC determination need not be supported by specific medical opinion); *Town v. Astrue*, No 3:12cv105, 2012 WL 6150836, at *4 (N.D. Ind. Dec. 10, 2012) ("The determination of an individual's RFC need not be based on a medical opinion because it is a determination reserved to the ALJ as fact-finder for the Commissioner."). Rather, an ALJ must *consider* all relevant evidence in the record, including the opinions of medical sources, and arrive at a determination of a claimant's RFC that is supported by substantial evidence. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); SSR 96-8p, 1996 WL 374184, at *5.

Here, the ALJ extensively considered the objective clinical and diagnostic findings, Claimant's statements, and the medical source opinions in arriving at the RFC finding. (Tr. at 75-84). The ALJ not only summarized this evidence in the written decision, but analyzed it and resolved any perceived conflicts within it. Despite the ALJ's assertion that he assigned "great weight" to some of the medical consultants' opinions, the ALJ was not required to adopt all of the limitations set forth in any one opinion. *Starcher*, 2013 WL 5504494, at *8 (approvingly citing Third Circuit case for proposition that ALJ is not bound to wholly adopt opinion of any medical expert). The ALJ clearly fulfilled his duty to review, analyze, and consider the evidence as a whole

in constructing Claimant's RFC finding.

Lastly, the undersigned **FINDS** that the Commissioner's decision is supported by substantial evidence. The ALJ recognized that Claimant's subjective statements comprised most of the evidence offered to corroborate his allegations of disabling pain. Accordingly, the ALJ conducted a thorough analysis of the objective medical evidence, the function reports supplied by Claimant, the statements made by Claimant to medical providers and others, Claimant's behavior and testimony at the administrative hearings, and the medical source opinions to gauge the reliability of Claimant's allegations of pain. The ALJ found many inconsistencies in Claimant's activities and statements that caused the ALJ to be skeptical of Claimant. (Tr. at 80-82). Moreover, the ALJ found no objective evidence to explain the severity, persistence, and intensity of the symptoms and limitations described by Claimant. The ALJ examined the function-by-function assessments provided by the agency experts and included in the RFC finding those restrictions that were supported by other evidence of record. Certainly, there is substantial evidence in the record bolstering each of the limitations contained in the RFC finding, and substantial evidence supporting the ALJ's decision not to include additional restrictions. All in all, the ALJ performed a methodical analysis of the evidence and explained how and why he resolved conflicts in the record. Therefore, the Commissioner's decision should be affirmed.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** the Commissioner's

request for judgment on the pleadings, (ECF No. 13); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court. The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if mailed) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: January 3, 2017

Cheryl A. Eifert
United States Magistrate Judge